*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

ELIZABETH ANN DUBOIS,

        Defendant-Appellee.

UNPUBLISHED
July 28, 2022

No. 359816
Lapeer Circuit Court
LC No. 19-013444-FC

Before: M. J. KELLY, P.J., and MURRAY and BORRELLO, JJ.

PER CURIAM.

In this interlocutory criminal appeal, the prosecution appeals by leave granted[1] the circuit court's order denying its motion to amend the complaint and information to add a charge of first-degree felony murder, MCL 750.316(1)(b). For the reasons set forth in this opinion, we reverse the circuit court's order denying the prosecution's motion to amend the complaint and information, and we remand for further proceedings consistent with this opinion.

## I. BASIC FACTS

This case arises from Dubois's failure to seek medical treatment for her son, Austin Raymond, despite his repeated requests that she do so and his evident illness. Dubois was initially charged with first-degree child abuse, MCL 750.136b(2) and second-degree child abuse, MCL 750.136b(3).[2] Austin testified at the preliminary examination on those charges.

---

[1] *People v Dubois*, unpublished order of the Court of Appeals, entered March 16, 2022 (Docket No. 359816).

[2] This Court recently explained that a second-degree child abuse conviction cannot be premised upon a failure to seek medical attention. See *People v Bryant*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 356125); slip op at 1. Although not raised as an issue by the parties, we note that because the evidence at the preliminary examination and the continued preliminary

Austin testified that he noticed something wrong with his throat in July 2016. At the time he was 15 years old. By September 2016, his symptoms had become significantly worse. He had trouble eating and noticed issues with his speech. He told Dubois of his symptoms, but she did not take any steps to seek treatment for him. By November 2016, Austin could not eat solid foods. He testified that he basically lived off Ramen Noodles and Mountain Dew. His energy levels were so low that, despite wanting to, he was unable to go hunting with his grandfather. As his symptoms worsened, he repeatedly asked Dubois to see a doctor. He again told her that he could not eat and added that he now had difficulty breathing. Dubois did not take him to a doctor. Instead, on multiple occasions, she told him that he "was fine" and that she did not "want to waste gas" on him. Other times she told him that he was just suffering from allergies. In December 2016, Dubois gave him a throat spray, but it did not help. Instead, Austin's symptoms continued to worsen and he also lost significant weight. Austin, who was 5'9" tall, estimated his weight to be approximately 86 pounds at that time.

On December 29, 2016, Child Protective Services (CPS) learned that Austin had been complaining of a sore throat for an extended period of time and begging to see a doctor. A CPS investigator responded to the home. She testified that Austin was very thin, pale, and could not speak clearly. Although it was very hard to understand him, the investigator ascertained that he wanted to go to the doctor. Dubois told the investigator that Austin's inability to speak was caused by a bad dental appointment in August or September 2016. Austin, however, testified that the last time he had been to the dentist was when he was in sixth grade, i.e., when he was approximately 11 years old. The CPS investigator directed Dubois to take Austin for medical treatment. Dubois waited two days and then told Austin's stepfather to take him to urgent care. At that visit, medical personnel indicated that Austin had "possible polyps" and directed follow-up care with an ear, nose, and throat specialist. Dubois did not follow-up, however.

At a family gathering in January 2017, Austin was weak, emaciated, and embarrassed about his physical appearance. He went to another room to be by himself, but his aunt, noticing his appearance, took his blood pressure. She then insisted that he be taken to the hospital immediately. Austin's sister, grandmother, and stepfather took him to a local hospital. Dubois did not go with them. That hospital referred Austin to the University of Michigan Hospital for treatment. Dubois did not go with him initially because she did not believe that there was anything wrong with him.

Austin was diagnosed with chordoma, a form of cancer. It was recommended that the cancerous mass be surgically removed, but Dubois initially withheld consent for the surgery. Although she later consented and the surgery was performed, a second surgery was also required. Because Austin was malnourished, however, the second surgery had to be delayed. During the delay, the cancerous mass grew.

---

examination only support an inference that Dubois failed to seek medical care for Austin, there is not probable cause to support the second-degree child abuse conviction. Consequently, on remand, the second-degree child abuse charge should be dismissed.

Following the first preliminary examination, on February 25, 2019, the district court bound Dubois over on the charges of first- and second-degree child abuse.

Austin died on May 20, 2019 from nasopharyngeal chordoma and dysphagia, both of which were complications from his cancer. Thereafter, the prosecution moved to amend its complaint and information to include one count of first-degree felony murder, MCL 750.316(1)(b), and one count of second-degree murder, MCL 750.317. The circuit court entered an order remanding the matter to the district court for a continued preliminary examination on the new charges.

At the continued preliminary examination, one of Austin's treating physicians testified. She explained that Austin had been diagnosed with malnutrition and chordoma. She estimated that the chance of survival for chordoma was approximately 70 to 80 percent and that time was of the essence in treating chordoma. The physician testified that Austin's chordoma was "massive." She explained that when Austin's second surgery was delayed due to his malnourishment, the tumor continued to grow, which further diminished his chances for survival. The physician stated that she could not say "with complete certainty" whether starting treatment a few weeks earlier would have made a difference. Yet, she clarified that there would "certainly" have been a difference in Austin's chance of survival if he had received treatment months earlier. She specifically noted that treatment following the onset of his symptoms would have led to the greatest chance of survival. She also opined that if the surgery had been done months earlier, Austin would have lived longer.

Following the continued preliminary examination, the district court bound Dubois over for trial on the second-degree murder charge, but not the felony-murder charge. The district court did not explain its reasoning. In response, the prosecution again moved in the circuit court to amend its complaint and information to include a felony-murder charge. The prosecution argued that, given the evidence presented at the preliminary examination, and given the court's decision to bind Dubois over for trial on first-degree child abuse and second-degree murder, the district court necessarily abused its discretion in refusing to bind Dubois over on the felony-murder charge. The circuit court disagreed that the district court had abused its discretion, so it denied the prosecution's motion.

## II. BINDOVER

### A. STANDARD OF REVIEW

The prosecution argues that the district court erred as a matter of law in refusing to bind Dubois over on the felony-murder charge. To bind a defendant over on a charge, the prosecution "must establish probable cause, which requires a quantum of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt on each element of the crime charged." *People v Yamat*, 475 Mich 49, 52; 714 NW2d 335 (2006) (quotation marks and citation omitted). "A district court's decision declining to bind a defendant over is reviewed for an abuse of discretion." *Id*. A circuit court's review of a district court's bind over decision is reviewed de novo "to determine whether the district court abused its discretion." *People v Crippen*, 242 Mich App 278, 281-282; 617 NW2d 760 (2000).

## B. ANALYSIS

"If it shall appear to the magistrate at the conclusion of the preliminary examination that a felony has been committed and there is probable cause for charging the defendant therewith, the magistrate shall forthwith bind the defendant" over to circuit court. *People v Mason*, 247 Mich App 64, 71; 634 NW2d 382 (2001), citing MCL 766.13. "The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). First-degree child abuse is a felony specifically enumerated by MCL 750.316(1)(b). Further, "felony murder is essentially second-degree murder, elevated by one of the felonies enumerated in MCL 750.316." *People v Maynor*, 256 Mich App 238, 243-244; 662 NW2d 468 (2003), aff'd 470 Mich 289 (2004).

Here, the district court found probable cause to believe that Dubois was guilty of first-degree child abuse and second-degree murder. By binding Dubois over on a second-degree murder charge, the district court necessarily found probable cause that Dubois caused Austin's death and that she acted with malice when she did so. Consequently, as it relates to the felony-murder charge, the court also should have found probable cause that the first and second elements were satisfied, i.e., that Dubois acted with malice when she caused Austin's death. By binding Dubois over on the first-degree child abuse charge, the court necessarily found probable cause that Dubois knowingly and intentionally caused serious physical or mental harm to Austin. See *People v Gould*, 255 Mich App 79, 87; 750 NW2d 140 (1997). The facts supporting the first-degree child abuse charge and the facts supporting the second-degree murder charge are essentially identical. The new evidence at the continued preliminary examination was that Austin had died because of Dubois's actions that had led to the court's finding of probable cause to support a charge of first-degree child abuse. The court also found that Dubois had caused Austin's death. Because the only basis for that finding was Dubois's failure to seek medical attention for Austin, the court necessarily found that there was probable cause that Dubois acted with malice when she killed Austin and that his death occurred as a result of first-degree child abuse. Thus, the failure to bind Dubois over on a felony-murder charge was an abuse of discretion. See *People v Plunkett*, 485 Mich 50, 61; 780 NW2d 280 (2010) ("A bindover is required when probable cause exists to support each of the elements of a crime."). Moreover, because the district court abused its discretion by failing to bind Dubois over for trial on the felon-murder charge, the circuit court erred by failing to grant the prosecution's motion to amend the complaint and information to add a felony-murder charge.

We are not persuaded by Dubois's argument on appeal that there was no evidence that the first-degree child abuse was the cause of Austin's death. Indeed, that argument is directly refuted by the record. The physician testified that the survival rate for chordoma was 70 to 80 percent. She opined that if treatment had been received when Austin started experiencing symptoms, he would have had a greater chance of survival. She also testified that he would "certainly" have had a greater chance of survival if he had started treatment months earlier. She also explained that Austin's malnourishment meant that the second surgery had to be delayed and that, during the delay, his tumor grew. Austin was malnourished because between July 2016 and January 2017,

-4-

he was unable to eat. Dubois, despite being told of that fact, refused to take him to a doctor.[3]  On this record, there is simply no support for Dubois's argument that there was no evidence of causation.  Indeed, the court found as much when it bound Dubois over on the second-degree murder charge.[4]

Reversed and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Stephen L. Borrello

---

[3] Given that Austin was 5'9" and weighed approximately 86 pounds as of December 2016, it is reasonable to infer that, in addition to being told that Austin could not eat, she was aware of the decline in his physical condition related to his inability to eat.

[4] On appeal, Dubois notes that there was a gap of 2 ½ years between when she failed to provide medical treatment to Austin and when he died.  She also directs this testimony to the physician's testimony indicating that she could not say for certain whether treatment provided weeks earlier would have resulted in a greater chance of survival.  Additionally, Dubois notes that because of the location and size of the tumor, Austin had a poor prognosis.  The district court could have relied upon that testimony to find that Dubois did not cause Austin's death.  It did not do so, however.  Instead, by binding Dubois over on the second-degree murder charge, it found probable cause to support a finding that Dubois had caused Austin's death.  The reviewing court is not entitled to substitute its judgment for that the district court.  See *Crippen*, 242 Mich App at 281-282.